**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

**In re:**

**SEAN PUCKETT
AKA SEAN P. PUCKETT
AKA SEAN PATRICK PUCKETT,**

**CHAPTER 13**

  **DEBTOR.**

**CASE NO. 14-24569-JFS**

**PHH MORTGAGE CORPORATION,**

  **MOVANT,**

**vs.**

**SEAN PUCKETT
and ELLEN W. COSBY, TRUSTEE,**

  **RESPONDENTS.**

**MOTION FOR RELIEF FROM THE AUTOMATIC STAY
(REAL PROPERTY LOCATED AT 203 GRAND DRIVE, TANEYTOWN, MD 21787)**

  PHH Mortgage Corporation ("Movant") hereby moves this Court, pursuant to 11 U.S.C. § 362, for relief from the automatic stay with respect to certain real property of the Debtor having an address of 203 Grand Drive, Taneytown, MD 21787 (the "Property"), for all purposes allowed by the Note (defined below), the Deed of Trust (defined below), and applicable law, including but not limited to the right to foreclose. In further support of this Motion, Movant respectfully states:

  1.  A petition under Chapter 13 of the United States Bankruptcy Code was filed with respect to the Debtor on September 18, 2014.

  2.  A Chapter 13 Plan was confirmed on December 31, 2014.

  3.  The Debtor has executed and delivered or is otherwise obligated with respect to that certain promissory note in the original principal amount of $226,800.00 (the "Note"). A copy of the Note is attached hereto as <u>Exhibit A</u>.

  4.  Pursuant to that certain Deed of Trust (the "Deed of Trust"), all obligations (collectively, the "Obligations") of the Debtor under and with respect to the Note and the Deed of Trust are secured by the Property and the other collateral described in the Deed of Trust. The lien created by the Deed of Trust was perfected by recording of the Deed of Trust in the office of the Clerk of the County of Carroll, Maryland. A copy of the recorded Deed of Trust is attached hereto as <u>Exhibit B</u>.

5.      As of March 13, 2015, the unpaid principal balance due is $217,513.80 and the approximate outstanding amount of Obligations less any partial payments or suspense balance through March 16, 2015 is $235,574.11.

6.      The following chart sets forth the number and amount of post-petition payments due pursuant to the terms of the Note that have been missed by the Debtor as of March 13, 2015:

| Number of Missed Payments | From | To | Monthly Payment Amount | Total Missed Payments |
|---|---|---|---|---|
| 6 | 10/01/2014 | 03/01/2015 | $1,040.81 | $6,244.86 |
| Less post-petition partial payments (suspense balance): | | | | ($0.00) |
| | | | Total Post-Petition Payments: | $6,244.86 |

7.      As of March 13, 2015, the total post-petition arrearage/delinquency is $6,244.86, consisting of (i) the foregoing total of missed post-petition payments in the amount of $6,244.86, plus (ii) the following fees:

| Fee Description | Amount |
|---|---|
| n/a | n/a |

8.      In addition to the other amounts due to Movant reflected in this Motion, as of the date hereof, in connection with seeking the relief requested in this Motion, Movant has also incurred $1,026.00 in legal fees and costs.

9.      A post-petition payment history is attached hereto as Exhibit 1.

10.     The estimated value of the Property is $161,600.00.  The basis for such valuation is: Tax Assessment, a copy of which is attached hereto as Exhibit C.

11.     Cause exists for relief from the automatic stay for the following reasons:

   i.      Movant's interest in the Property is not adequately protected.

   ii.     Post-Petition payments required by the confirmed plan have not been made to Movant.

   iii.    Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and pursuant to § 362(d)(2)(B), the Property is not necessary for an effective reorganization.

WHEREFORE, Movant prays that this Court issue an Order terminating or modifying the stay and granting the following:

1.      Relief from the stay for all purposes allowed by applicable law, the Note, and the Deed of Trust, including but not limited to allowing Movant to proceed under applicable non-bankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property and any and all other collateral pledged under the Deed of Trust.

2.      That the 14-day stay described by Bankruptcy Rule 4001(a)(3) be waived.

3.      For such other relief as the Court deems proper.

Dated: March 23, 2015.

PHH MORTGAGE CORPORATION

By:**/s/KIMBERLY B. LANE**
Randa S. Azzam, Esquire, Bar No. 22474
Kimberly B. Lane, Esquire, Bar No. 18513
Samuel I. White, P. C.
611 Rockville Pike,
Suite 100
Rockville, MD 20852
Tel: (301) 804-3400
Fax: (301) 838-1954
klane@siwpc.com

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Motion was served by first class mail postage prepaid or email this 23rd day of March, 2015 on all necessary parties including Ellen W. Cosby, Trustee, 300 E Joppa Road, Suite 409, Towson, MD 21286; Edward M. Miller, Counsel for Debtor, 202 E. Main St., 1st Floor, Westminster, MD 21157; and Sean Puckett, Debtor, 203 Grand Dr., Taneytown, MD 21787-2305.

 **/s/KIMBERLY B. LANE**
Kimberly B. Lane, Esquire
Samuel I. White, P. C.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

**In re:**

**SEAN PUCKETT
AKA SEAN P. PUCKETT
AKA SEAN PATRICK PUCKETT,**

      **CHAPTER 13**

      **DEBTOR.**

      **CASE NO. 14-24569-JFS**

**PHH MORTGAGE CORPORATION,**

      **Movant.**

**vs.**

**SEAN PUCKETT
and ELLEN W. COSBY, TRUSTEE,**

      **Respondents.**

**NOTICE OF MOTION AND OPPORTUNITY TO OBJECT TO MOTION
FOR RELIEF FROM THE AUTOMATIC STAY AND HEARING THEREON**

      PHH Mortgage Corporation ("Movant"), has filed papers with the court seeking relief from the automatic stay of 11 U.S.C. §362(a) to enable it to proceed to foreclose on its Deed of Trust referencing the subject property known as 203 Grand Drive, Taneytown, MD 21787.  Your rights may be affected.  You should read these papers carefully and discuss them with your lawyer, if you have one in this bankruptcy case.  (If you do not have a lawyer, you may wish to consult one.).

      If you do not want the court to grant the motion for relief from the stay, or if you want the court to consider your views on the motion, then by April 9, 2015, you or your lawyer must file a written response with the Clerk of the Bankruptcy Court explaining your position and mail a copy to:

        Kimberly B. Lane
        611 Rockville Pike
        Suite 100
        Rockville, MD 20852
        and

        Ellen W. Cosby
        300 E. Joppa Road
        Suite 409
        Towson, MD 21286

      If you mail a copy rather than deliver your response to the Clerk of the Bankruptcy Court for filing, you must mail it early enough so that the Court will receive it by the date stated above.

The hearing is scheduled for May 7, 2015, 2015, at 10:00 AM, in the United States Bankruptcy Court for the District of Maryland, 101 West Lombard Street, Baltimore, MD 21201, Courtroom 9-C.

IF YOU OR YOUR LAWYER DO NOT TAKE THESE STEPS BY THE DEADLINE, THE COURT MAY DECIDE THAT YOU DO NOT OPPOSE THE RELIEF SOUGHT IN THE MOTION AND MAY GRANT OR OTHERWISE DISPOSE OF THE MOTION BEFORE THE SCHEDULED HEARING DATE.

DATE SERVED:  March 23, 2015

**/s/KIMBERLY B. LANE**
Randa S. Azzam, Esquire, Bar No. 22474
Kimberly B. Lane, Esquire, Bar No. 18513
Samuel I. White, P. C.
611 Rockville Pike,
Suite 100
Rockville, MD 20852
Tel: (301) 804-3400
Fax: (301) 838-1954
klane@siwpc.com

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Notice of Motion was served by first class mail postage prepaid or email this 23rd day of March, 2015 on all necessary parties including Ellen W. Cosby, 300 E Joppa Road, Suite 409, Towson, MD 21286; Edward M. Miller, Counsel for Debtor, 202 E. Main St., 1st Floor, Westminster, MD 21157; and Sean Puckett, Debtor, 203 Grand Dr., Taneytown, MD 21787-2305

  **/s/KIMBERLY B. LANE**
Kimberly B. Lane, Esquire
Samuel I. White, P. C.

# FIXED/ADJUSTABLE RATE NOTE
(LIBOR One-Year Index (As Published In *The Wall Street Journal*)-Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

April 28, 2006                    TANEYTOWN                    Maryland
[Date]                            [City]                      [State]

203 GRAND DRIVE TANEYTOWN, MD 21787
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $226,800.00           (this amount is called "Principal"), plus interest, to the order of Lender. Lender is Coldwell Banker Mortgage

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of           5.817 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on June 1st, 2006 I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 1st, 2036           , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 3000 Leadenhall Road Mount Laurel, NJ 08054

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1333.22           . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of May, 2011           , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR - Single Family - Fannie Mae Uniform Instrument

VMP-168N (0210)                    Form 3528 6/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 5                        Initials

Represents Redacted Information

The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two and Twenty-Five / Hundredths**                 percentage points (                2.2500%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than                **10.817** % or less than                **2.250** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than                **10.817**%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change  The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

#### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00% of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

#### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

#### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

#### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

#### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 8.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, and a Pledge Agreement for Securities Account, if applicable, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Initials ____

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Sean P Puckett                -Borrower                                      -Borrower


_____ (Seal)          _____ (Seal)
                              -Borrower                                      -Borrower


_____ (Seal)          _____ (Seal)
                              -Borrower                                      -Borrower


_____ (Seal)          _____ (Seal)
                              -Borrower                                      -Borrower


[Sign Original Only]

PAY TO THE ORDER OF

WITHOUT RECOURSE

Janice Grant, Assistant Vice President
PHH Mortgage Corporation


-168N (0210)                          Page 5 of 5                          Form 3528 6/01

## LOW DOWN PAYMENT FEE MORTGAGE ADDENDUM TO NOTE

THIS LOW DOWN PAYMENT FEE MORTGAGE ADDENDUM TO NOTE is made this 28th day of April, 2006, and is incorporated into and shall amend and supplement the Note made by the undersigned ("Borrower"), in favor of Coldwell Banker Mortgage ("Lender") and dated the same date as this Addendum (the "Note"). The Note is secured by a security instrument, as modified or amended, in favor of Lender dated the 28th day of April, 2006 (the "Security Instrument"). As in the Note, Lender or anyone who takes the Note by transfer and who is entitled to receive payments under the Note is called the "Note Holder."

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Note, Borrower and Note Holder further covenant and agree as follows:

I.   **LOW DOWN PAYMENT FEES**

Borrower hereby agrees to pay Low Down Payment Fees ("LDP Fees") totaling U.S. $70.88 each month of which (i) $70.88 is in lieu of paying premiums for private mortgage insurance, which Lender would otherwise require for a loan with loan to value ratio in excess of 80%, and (ii) $ 0.00 is to compensate Note Holder for additional activities needed to service a mortgage with the Low Down Payment Fee Option. Borrower will pay the LDP Fees until the earlier of (a) the First Cancellation Date (as defined in I.A below) or the Second Cancellation Date (as defined in I.B below), provided that the conditions described in I.A. or I.B. below, as applicable, are satisfied; or (b) the Termination Date (as defined in I.C below), provided that Borrower's monthly payments are current at that time. The LDP Fees will be added to the amount of Borrower's monthly payment which Borrower has agreed to pay pursuant to Section 3(B) of the Note. Therefore, until such time as the LDP Fees is terminated, Borrower's required total monthly payment will be U.S. $1,404.10. If the Note is an adjustable rate note, Borrower understands that the foregoing total monthly payment is the amount of the initial total monthly payment, which may change pursuant to Sections 3 and 4 of the Note.

**A.   First Cancellation Date**

The "First Cancellation Date" is defined as the date that is the first monthly payment due date after Note Holder has verified that Borrower has satisfied all of the following requirements: (1) Borrower must request cancellation in writing from the Note Holder; (2) the mortgage balance: (a) is first scheduled to reach 80% of the original property value; or (b) actually reaches 80% of the original property value; (3) Borrower is current on payments and has demonstrated a Good Payment History (as described below); and (4) the then-current value of the property is at least equal to the original property value. (The then-current property value will be based on a new appraisal or broker's price opinion obtained by Note Holder and paid for by Borrower.)

For purposes of the First Cancellation Date, Borrower is current if the payment due in the month before the First Cancellation Date, all prior monthly payments, and any outstanding late charges have been paid by the end of the month before the First Cancellation Date. In addition, Borrower will have demonstrated a Good Payment History if Borrower has had neither (1) a payment thirty (30) days or more past due in the twelve (12) months preceding the payment due date immediately prior to the First Cancellation Date, nor (2) a payment sixty (60) days or more past due in the twenty-four (24) months preceding the payment due date immediately prior to the First Cancellation Date. If Borrower has had the mortgage loan for less than twenty-four (24) months, this payment history requirement will be based on the length of time Borrower has had the mortgage loan.

**B.   Second Cancellation Date**

The "Second Cancellation Date" is defined as the date that is the first monthly payment due date after Note Holder has verified that Borrower has satisfied all of the following requirements: (1) Borrower must request cancellation in writing; (2) the mortgage balance must be paid down to a point that it, (a) if within 2 to 5 years of the date of this document, reaches 75% of the current property value, or (b) if after 5 years of the date of this document, reaches 80% of the current property value (current property value to be based on a new appraisal obtained by Note Holder and paid for by Borrower); (3) Borrower is current on payments and has a Good Payment History (as described below); and (4) the loan must have at least a twenty-four (24) month history.

For purposes of the Second Cancellation Date, Borrower is current if the payment due in the month before the Second Cancellation Date, all prior monthly payments, and any outstanding late charges have been paid by the end of the month before the Second Cancellation Date  In addition, Borrower will have demonstrated a Good Payment History if Borrower has had neither (1) a payment thirty (30) days or more past due in the twelve (12) months preceding the payment due date immediately prior to the Second Cancellation Date, nor (2) a payment sixty (60) days or more past due in the twenty-four (24) months preceding the payment due date immediately prior to the Second Cancellation Date.

**C. Termination Date**

The "Termination Date" is defined as the earlier of: (1) the date that the mortgage balance is first scheduled to reach 78% of the original value of the property; or (2) the first day of the month after the date that is the mid-point of the original mortgage amortization period.

For purposes of the Termination Date, Borrower's monthly payments will be deemed to be current if the payment due in the month before the Termination Date, all prior monthly payments, and any outstanding late charges have been paid by the end of the month before the Termination Date.  If Borrower's monthly payments are not current on the Termination Date, the LDPF will be terminated thereafter on the first payment due date following the date on which Borrower's monthly payments become current

**D. New Payment Amount**

If and when the LDPF is terminated as described above, Note Holder will advise Borrower (1) of the amount of the new monthly payment that would be sufficient to repay the unpaid principal Borrower will owe on the date the LDPF is terminated, in full by the maturity date at Borrower's Note Rate in substantially equal payments (the result of the calculation will be Borrower's "New Payment Amount"); and (2) the date on which the New Payment Amount is to commence, which shall be the next payment due date after the First Cancellation Date, the Second Cancellation Date, or the Termination Date, as applicable.

**E. Original Property Value**

For purposes of this Low Down Payment Mortgage Addendum to Note, the original property value is $252,000.00.  Borrower acknowledges said value is: a) with respect to purchase money loans, the lesser of the purchase price or the appraised property value; or b) with respect to refinance transactions, the appraised property value if one was required, or in the absence of an appraisal at origination, the estimated value of the property Borrower provided at the time of loan approval.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Low Down Payment Mortgage Addendum to Note.

_____
Borrower    Sean P Puckett

_____
Borrower

_____
Borrower

_____
Borrower

# SIGNATURE/NAME AFFIDAVIT

DATE: April 28, 2006

BORROWER  Sean P Puckett

THIS IS TO CERTIFY THAT MY LEGAL SIGNATURE IS AS WRITTEN AND TYPED BELOW.
(This signature must <u>exactly</u> match signatures on the Note and Mortgage or Deed of Trust.)

Sean P Puckett
_____        _____
(Print or Type Name)                                   Signature

(If applicable, complete the following.)

I AM ALSO KNOWN AS:

_____        _____
(Print or Type Name)                                   Signature

_____        _____
(Print or Type Name)                                   Signature

_____        _____
(Print or Type Name)                                   Signature

_____        _____
(Print or Type Name)                                   Signature

and that                                                                                      are one

and the same person.

State/Commonwealth of MD
County/Parish of CARROLL

Subscribed and sworn (affirmed) before me
this 28th         day of April         , 2006

DENISE A. MERSON
Notary Public State of Maryland
Carroll County

Notary Public in and for
the State/Commonwealth of MD
County/Parish of CARROLL
My Commission Expires: 02/01/2007

VMP-304 (0103).01                    VMP Mortgage Solutions (800)521-7291                    3/01

4/28/2006 7:21 PM

*STATE OF NEW JERSEY*
*DEPARTMENT OF THE TREASURY*
*SHORT FORM STANDING*

**PHH MORTGAGE CORPORATION**

*0100051189*

*With the Previous or Alternate Name*

**COLDWELL BANKER MORTGAGE (Alternate Name)**
**INSTAMORTGAGE.COM (Alternate Name)**
**PHH MORTGAGE SERVICES (Alternate Name)**
**CENDANT MORTGAGE SERVICES CORPORATION (Previous Name)**
**PHH MORTGAGE SERVICES CORPORATION (Previous Name)**
**UNITED STATES MORTGAGE CORPORATION (Previous Name)**
**US MORTGAGE CORPORATION (Previous Name)**
**PHH US MORTGAGE CORPORATION (Previous Name)**
**MORTGAGESAVE.COM (Alternate Name)**
**CENTURY 21 MORTGAGE (Alternate Name)**
**ERA MORTGAGE (Alternate Name)**
**CENDANT MORTGAGE CORPORATION (Previous Name)**
**DOMAIN DISTINCTIVE PROPERTY FINANCE (Alternate Name)**

*I, the Treasurer of the State of New Jersey, do hereby certify that the above-named New Jersey Domestic Profit Corporation was registered by this office on November 16, 1977.*

*As of the date of this certificate, said business continues as an active business in good standing in the State of New Jersey, and its Annual Reports are current.*

*I further certify that the registered agent and registered office are:*

> *Corporation Service Company*
> *830 Bear Tavern Road*
> *West Trenton, NJ 08628*

*STATE OF NEW JERSEY*
*DEPARTMENT OF THE TREASURY*
*SHORT FORM STANDING*

*PHH MORTGAGE CORPORATION*

*0100051189*



*IN TESTIMONY WHEREOF, I have*
*hereunto set my hand and affixed my*
*Official Seal at Trenton, this*
*30th day of December, 2010*

*Andrew P Sidamon-Eristoff*
*State Treasurer*

Certification#  119103524

Verify this certificate at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

**Exhibit B**

BOOK 4855 PAGE 0491

Carroll County Commissioners
RECORDATION TAX
AMT: $0
DATE: 5/4/06
INITIALS:

Return To:

Coldwell Banker Mortgage
2001 Bishops Gate Blvd.
Mount Laurel, NJ 08054

JUN - 2006

Prepared By:
Kathleen Masapollo, 3000
Leadenhall Road Mount
Laurel, NJ 08054

[Above This Line For Recording Data]

5/1 LIBOR ARM (L66)
Purchase money

CARROLL CO

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated April 28, 2006            ,
together with all Riders to this document.
**(B) "Borrower"** is Sean P Puckett, AN UNMARRIED MAN

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is Coldwell Banker Mortgage

Lender is a Corporation
organized and existing under the laws of New Jersey

```
IMP FD SURE          20.00
RECORDING FEE        20.00
TOTAL                40.00
Regt CR02  .  Rcpt # 73016
LMS   RLC    Blk # 997
May 04, 2006        01:33 PM
```

MARYLAND-Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3021  1/01

VMP -6A(MD) (0005)

Page 1 of 15                    Initials:

VMP MORTGAGE FORMS - (800)521-7291

MAY 1 5 2006

Represents Redacted Information

BOOK 4 8 5 3, PAGE 0 4 3 2

Lender's address is 3000 Leadenhall Road Mount Laurel, NJ 08054

(D) "Trustee" is Michael Dufour, Esquire

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated April 28, 2006

The Note states that Borrower owes Lender Two Hundred Twenty-Six Thousand Eight

Hundred Dollars and Zero Cents                                              Dollars

(U.S. $226,800.00         ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1st, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

lowdown payment rider

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

Initials: _____

-6A(MD) (0005)                    Page 2 of 15                              Form 3021  1/01

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY        of        CARROLL      :

[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]

See exhibit A attached hereto and made a part hereof

Parcel ID Number:
**203  GRAND DRIVE**
**TANEYTOWN**
("Property Address"):

which currently has the address of
[Street]
[City], Maryland  **21787**    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

## Exhibit A

BEING KNOWN AND DESIGNATED as Lot No. 25, Block C, as shown on a Plat entitled, "Second Amended Plat of Section One and First Amended Plat of Section Two, Green Meadows," which Plat is recorded among the Land Records of Carroll County in Plat Book No. 28, page 137.  The improvements thereon currently being known as No. 203 Grand Drive.

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's

obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

 Initials:

VMP®-6A(MD) (0005)                    Page 6 of 15                    Form 3021  1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

BOOK 1853 PAGE 0440

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

VMP -6A(MD) (0005)                    Page 9 of 15               Initials: _SM_        Form 3021   1/01

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

-6A(MD) (0005)                    Page 11 of 15                    Initials: _____                    Form 3021   1/01

BOOK 4853 PAGE 0443

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the**

BOOK 11 8 5 3 PAGE 0 4 4 4

default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale, assent to decree, and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

  If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail a notice of sale to Borrower in the manner prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement and by such other means as required by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale and by notice to any other persons as required by Applicable Law. Lender or its designee may purchase the Property at any sale.

  Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of          5.00 % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

  Borrower, in accordance with Title 14, Chapter 200 of the Maryland Rules of Procedure, does hereby declare and assent to the passage of a decree to sell the Property in one or more parcels by the equity court having jurisdiction for the sale of the Property, and consents to the granting to any trustee appointed by the assent to decree of all the rights, powers and remedies granted to the Trustee in this Security Instrument together with any and all rights, powers and remedies granted by the decree. Neither the assent to decree nor the power of sale granted in this Section 22 shall be exhausted in the event the proceeding is dismissed before the payment in full of all sums secured by this Security Instrument.

  **23.   Release.** Upon payment of all sums secured by this Security Instrument, Lender or Trustee, shall release this Security Instrument and mark the Note "paid" and return the Note to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

  **24.   Substitute   Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the city or county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

  **25. Possession of the Property.** Borrower shall have possession of the Property until Lender has given Borrower notice of default pursuant to Section 22 of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
Sean P Puckett                                                -Borrower

_____

_____ (Seal)
                                                                        -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                               -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                               -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                               -Borrower

STATE OF MARYLAND, CARROLL                                    County ss:
    I Hereby Certify, That on this 28th        day of **April, 2006**    , before me, the subscriber, a
Notary Public of the State of Maryland, in and for the CARROLL **County**                    ,
personally appeared **Sean P Puckett**

known to me or satisfactorily proven to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledge that he/she/they executed the same for the purposes therein contained.
    AS WITNESS: my hand and notarial seal.
My Commission Expires:

**02/01/2007**                          Notary Public

**DENISE A. MERSON**
Notary Public State of Maryland
Carroll County

STATE OF MD                                          **Carroll**          County ss:
    I Hereby Certify, That on this  **28th**   day of **April 06**  , before me, the subscriber,
a Notary Public of the State of MD         and for the **County of Carroll**          ,
personally appeared **Joe Cservek**
the agent of the party secured by the foregoing Deed of Trust, and made oath in due form of law that the
consideration recited in said Deed of Trust is true and bona fide as therein set forth and that the actual sum
of money advanced at the closing transaction by the secured party was paid over and disbursed by the party
or parties secured by the Deed of Trust to the Borrower or to the person responsible for disbursement of
funds in the closing transaction or their respective agent at a time not later than the execution and delivery
by the Borrower of this Deed of Trust; and also made oath that he is the agent of the party or parties
secured and is duly authorized to make this affidavit.
    AS WITNESS: my hand and notarial seal.
My Commission Expires:                             Notary Public

**02/01/2007**

**DENISE A. MERSON**
Notary Public State of Maryland
Carroll County

    This is to certify that the within instrument was prepared Kathleen  Masapollo

**Alex Joseph Cservek, Attorney**
THIS IS TO CERTIFY THE WITHIN
INSTRUMENT WAS PREPARED UNDER        Kathleen  Masapollo, Coldwell Banker
THE SUPERVISION OF AN ATTORNEY
DULY ADMITTED TO PRACTICE
BEFORE THE COURT OF APPEALS OF
MARYLAND
**Alex Joseph Cservek**                                                        Initials:
-6A(MD) (0005).02                              Page 15 of 15                Form 3021  1/01

# LOW DOWN PAYMENT FEE MORTGAGE RIDER TO SECURITY INSTRUMENT

THIS LOW DOWN PAYMENT FEE MORTGAGE RIDER TO SECURITY INSTRUMENT is made this 28th day of April, 2006, and is incorporated into and shall amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note to Coldwell Banker Mortgage ("Lender") covering the Property described in the Security Instrument and located at:

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.  LOW DOWN PAYMENT FEE
The Note and the Low Down Payment Addendum to Note provide for the monthly payment of a Low Down Payment Fee as follows:

### 1.  LOW DOWN PAYMENT FEES
Borrower hereby agrees to pay Low Down Payment Fees ("LDP Fees") totaling U.S. $70.88 each month of which (i) $70.88 is in lieu of paying premiums for private mortgage insurance, which Lender would otherwise require for a loan with loan to value ratio in excess of 80%, and (ii) $ 0.00 is to compensate Note Holder for additional activities needed to service a mortgage with the Low Down Payment Fee Option. Borrower will pay the LDP Fees until the earlier of (a) the First Cancellation Date (as defined in 1.A below) or the Second Cancellation Date (as defined in 1.B below), provided that the conditions described in 1.A. or 1.B. below, as applicable, are satisfied; or (b) the Termination Date (as defined in 1.C below), provided that Borrower's monthly payments are current at that time. The LDP Fees will be added to the amount of Borrower's monthly payment which Borrower has agreed to pay pursuant to Section 3(B) of the Note. Therefore, until such time as the LDP Fees is terminated, Borrower's required total monthly payment will be U.S. $1,404.10. If the Note is an adjustable rate note, Borrower understands that the foregoing total monthly payment is the amount of the initial total monthly payment, which may change pursuant to Sections 3 and 4 of the Note.

#### A.  First Cancellation Date
The "First Cancellation Date" is defined as the date that is the first monthly payment due after Note Holder has verified that Borrower has satisfied all of the following requirements: (1) Borrower must request cancellation in writing for the Note Holder; (2) the mortgage balance: (a) is first scheduled to reach 80% of the original property value; or (b) actually reaches 80% of the original property value; (3) Borrower is current on payments and has demonstrated a Good Payment History (as described below); and (4) the then-current value of the property is at least equal to the original property value. (The then-current property value will be based on a new appraisal or broker's price obtained by Note Holder and paid for by Borrower.)

BOOK 4853 PAGE 0448

For purposes of the First Cancellation Date, Borrower is current if the payment due in the month before the First Cancellation Date, all prior monthly payments, and any outstanding late charges have been paid by the end of the month before the First Cancellation Date. In addition, Borrower will have demonstrated a Good Payment History if Borrower has had neither (1) a payment thirty (30) days or more past due in the twelve (12) months preceding the payment due date immediately prior to the First Cancellation Date, nor (2) a payment sixty (60) days or more past due in the twenty-four (24) months preceding the payment due date immediately prior to the First Cancellation Date. If Borrower has had the mortgage loan for less than twenty-four (24) months, this payment history requirement will be based on the length of time Borrower has had the mortgage loan.

**B. Second Cancellation Date**

The "Second Cancellation Date" is defined as the date that is the first monthly payment due date after Note Holder has verified that Borrower has satisfied all of the following requirements: (1) Borrower must request cancellation in writing; (2) the mortgage balance must be paid down to a point that it, (a) if within 2 to 5 years of the date of this document, reaches 75% of the current property value, or (b) if after 5 years of the date of this document.

For purposes of the Second Cancellation Date, Borrower is current if the payment due in the month before the Second Cancellation Date, all prior monthly payments, and any outstanding late charges have been paid by the end of the month before the Second Cancellation Date. In addition, Borrower will have demonstrated a Good Payment History if Borrower has had neither (1) a payment thirty (30) days or more past due in the twelve (12) months preceding the payment due date immediately prior to the Second Cancellation Date, nor (2) a payment sixty (60) days or more past due in the twenty-four (24) months preceding the payment due date immediately prior to the Second Cancellation Date.

**C. Termination Date**

The "Termination Date" is defined as the earlier of: (1) the date that the mortgage balance is first scheduled to reach 78% of the original value of the property; or (2) the first day of the month after the date that is the mid-point of the original mortgage amortization period.

For purposes of the Termination Date, Borrower's monthly payments will be deemed to be current if the payment due in the month before the Termination Date, all prior monthly payments, and any outstanding late charges have been paid by the end of the month before the Termination Date. If Borrower's monthly payments are not current on the Termination Date, the LDPF will be terminated thereafter on the first payment due date following the date on which Borrower's monthly payments become current

**D. New Payment Amount**

If and when the LDPF is terminated as described above, Note Holder will advise Borrower (1) of the amount of the new monthly payment that would be sufficient to repay the unpaid principal Borrower will owe on the date the LDPF is terminated, in full by the maturity date at Borrower's Note Rate in substantially equal payments (the result of the calculation will be Borrower's "New Payment Amount"); and (2) the date on which the New Payment Amount is to commence, which shall be the next payment due date after the First Cancellation Date, the Second Cancellation Date, or the Termination Date, as applicable.

**E. Original Property Value**

For purposes of this Low Down Payment Mortgage Rider to Security Instrument, the original property value is $252,000.00. Borrower acknowledges said value is: a) with respect to purchase money loans, the lesser of the purchase price or the appraised property value; or b) with respect to refinance transactions, the appraised property value if one was required, or in the absence of an appraisal at origination, the estimated value of the property Borrower provided at the time of loan approval.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Low Down Payment Mortgage Rider to Security Instrument.

_____
Borrower    Sean P Puckett

_____
Borrower

_____
Borrower

_____
Borrower

# FIXED/ADJUSTABLE RATE RIDER
## (LIBOR One-Year Index (As Published In *The Wall Street Journal*)- Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 28th    day of April, 2006         ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to
secure Borrower's Fixed/Adjustable Rate Note (the "Note") to Coldwell Banker Mortgage

("Lender") of the same date and covering the property described in the Security Instrument and located at:
203 GRAND DRIVE TANEYTOWN, MD 21787

[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

### A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of                    5.817%. The Note also
provides for a change in the initial fixed rate to an adjustable interest rate, as follows:
### 4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
#### (A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of
May, 2011         , and the adjustable interest rate I will pay may change on that
day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable
interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR- Single Family -
Fannie Mae Uniform Instrument

VMP-168R (0108)         Form 3187 6/01
Page 1 of 4                Initials:
VMP MORTGAGE FORMS - (800)521-7291

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and Twenty-Five / Hundredths                                                         percentage points
(          2.2500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.817 % or less than                    2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than                    10.817 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

VMP-168R (0108)                          Page 2 of 4                    Initials: _____          Form 3187 6/01

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all

VMP-168R (0108)                    Page 3 of 4              Initials: _____          Form 3187 6/01

BOOK 4 8 3 5 PAGE 04 53

sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)     _____ (Seal)
Sean P Puckett                    -Borrower                                    -Borrower


_____ (Seal)     _____ (Seal)
                                  -Borrower                                    -Borrower


_____ (Seal)     _____ (Seal)
                                  -Borrower                                    -Borrower


_____ (Seal)     _____ (Seal)
                                  -Borrower                                    -Borrower


VMP-168R (0108)              Page 4 of 4                  Form 3187 6/01

RCVD 06 MAY04'06 13:34

7412 · 0164

Date available 07/23/2013. Printed 03/17/2015.

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0164,

Carroll County Commissioners
RECORDATION TAX
AMT: 110 00
DATE: 5-1-13
INITIALS:

_____ [Space Above This Line For Recording Data] _____

Original Recording Date: **May 04, 2006**                          Loan No.:
Original Loan Amount: **$226,800.00**                          Investor Loan No:
                                                               MIN Number:

# HOME AFFORDABLE MODIFICATION AGREEMENT

Borrower ("I"): **SEAN P PUCKETT, AN UNMARRIED MAN.** If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.
Lender or Servicer ("Lender"): **COLDWELL BANKER MORTGAGE, whose address is 1 Mortgage Way, Mount Laurel, NJ 08054**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"):
**April 28, 2006**
Loan Number:
Property Address ("Property"):  **203 GRAND DRIVE
                                 TANEYTOWN, MD 21787**

"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under the Mortgage. MERS is organized and existing under the laws of Delaware, and has a mailing address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. The MERS street address is 3300 S.W. 34th Avenue, Suite 101, Ocala, FL 34474.

**Legal Description:**
**See Exhibit "A" attached hereto and made a part hereof;**

**Prior instrument reference: Book/Libor 4853, Page 0431-453, Instrument No: 726450, of the Official Records of CARROLL County, MD.**

If my representations and covenants in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Loan No:                                          Form 3157  3/09  (rev. 10/10) (page 1 of 9 pages)
8306 03/11

7.412.    0165

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0165          Date available 07/23/2013. Printed 03/17/2015.

and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1. **My Representations and Covenants**. I certify, represent to Lender, covenant and agree:

   A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or my default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;
   B. One of the borrowers signing this Agreement lives in the Property as a principal residence, and the Property has not been condemned;
   C. There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;
   D. I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification Program ("Program"));
   E. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;
   F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and
   G. I have made or will make all payments required under a trial period plan.

2. **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

   A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

   B. I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3. **The Modification.** If my representations and covenants in Section 1 continue to be true in all material

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Loan No: ▮▮▮▮▮▮▮                                    Form 3157  3/09  (rev. 10/10) (page 2 of 9 pages)
8306 03/11

7.412    0166

Date available 07/23/2013. Printed 03/17/2015.

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0166,

respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **October 1, 2011** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a trial period plan, this modification will not take effect. The first modified payment will be due on **October 1, 2011**.

A. The Maturity Date will be: **September 1, 2051**.

B. The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be **$223,247.74** (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C. **$9,117.92** of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and I will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is **$214,129.82**. Interest at the rate of **2.000%** will begin to accrue on the Interest Bearing Principal Balance as of **September 01, 2011** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **October 1, 2011**. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Prin & Int Payment Amount | Monthly Escrow Payment Amount | Total Monthly Payment | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------|-------------------------------|-----------------------|-------------------|----------------------------|
| 1-5 | 2.000% | September 01, 2011 | $648.44 | $315.83 May adjust periodically | $964.27 May adjust periodically | October 01, 2011 | 60 |
| 6 | 3.000% | September 01, 2016 | $753.34 | May adjust periodically | May adjust periodically | October 01, 2016 | 12 |
| 7 | 4.000% | September 01, 2017 | $864.06 | May adjust periodically | May adjust periodically | October 01, 2017 | 12 |
| 8-40 | 4.125% | September 01, 2018 | $878.13 | May adjust periodically | May adjust periodically | October 01, 2018 | 396 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3157  3/09  (rev. 10/10) *(page 3 of 9 pages)*
**Loan No:** ▇▇▇▇▇▇▇
8306 03/11

7412    0167

Documents, including but not limited to, provisions for an adjustable, step or simple interest rate. I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest being added to the outstanding principal balance.

D.   I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.   If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F.   I agree to pay in full the Deferred Principal Balance and any other amounts still owed under the Loan Documents by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

4.   **Additional Agreements**.  I agree to the following:

A.   That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.   That this Agreement shall supersede the terms of any modification, forbearance, trial period plan or other workout plan that I previously entered into with Lender.

C.   To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.   That this Agreement constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my escrow account

E.   That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
**Loan No:** ▮▮▮▮▮▮▮                                    Form 3157  3/09  (rev. 10/10) *(page 4 of 9 pages)*
8306 03/11

Date available 07/23/2013. Printed 03/17/2015.

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0167,

7412    0168

Date available 07/23/2013. Printed 03/17/2015.

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0168,

F.   That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G.   That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H.   That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I.   That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J.   That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.   That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Loan No: ███████                                                    Form 3157  3/09  (rev. 10/10) *(page 5 of 9 pages)*

8306 03/11

7412    0169

Date available 07/23/2013. Printed 03/17/2015.

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0169

this Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

L.  Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.  In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M.  That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity.    In addition, I understand and consent to the disclosure of my personal information and the terms of the trial period plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

N.  That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents."  I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O.  That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

P.  This Agreement modifies an obligation secured by an existing security instrument recorded in CARROLL County, MD, upon which all recordation taxes have been paid.  As of the date of this agreement, the unpaid principal balance of the original obligation secured by the existing security instrument is $212,698.23.  The principal balance secured by the existing security instrument as a result of this Agreement is $223,247.74, which amount represents the excess of the unpaid

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Loan No: ▮▮▮▮▮▮▮▮
8306 03/11

Form 3157  3/09  (rev. 10/10) *(page 6 of 9 pages)*

7412    0170

principal balance of this original obligation.

In Witness Whereof, the Lender and I have executed this Agreement.

_____ (Seal)

**SEAN P PUCKETT** -Borrower

_____ [Space Below This Line For Acknowledgments] _____

State of Maryland, _CARROll_ _____ County, to wit:

I hereby certify, that on this _23rd_ day of _September_ ___, in the year _2011_,
before the subscriber, _DAwn MARiE mitchell_ , personally appeared
**SEAN P PUCKETT, AN UNMARRIED MAN**, and acknowledged the foregoing deed to be his act.

_Dawn Marie Mitchell_
(Signature)

My commission expires : _4/10/12_ _____

increasing Mortgage **Amount**
by  $ _10 549.51_
from $ _212 698.23_
to    $ _223 247.74_

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3157  3/09  (rev. 10/10) *(page 7 of 9 pages)*
**Loan No:** ▮▮▮▮▮▮
8306 03/11

Date available 07/23/2013. Printed 03/17/2015.

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0170,

7412    0171

**COLDWELL BANKER MORTGAGE**

By: _____ (Seal)
                                                              -Lender
Name:
Title:          **CANDACE GALLARDO, ASST. V.P.**

_____ [Space Below This Line For Acknowledgments] _____

State of New Jersey, County of Burlington

On _____4/5_____, 20 12 before me, _Beth Lashley_____,
a notary Public in and for said State, personally appeared
**CANDACE GALLARDO, ASST. V.P.**

_____

_____
of the Corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the
individual whose name is subscribed to the within instrument and acknowledged to me that they executed
the same in their capacity, and that by their signature on the instrument, the individual, or the person upon
behalf of which the individual acted, executed the instrument.

_____
Notary Public

_____
Notary Public of New Jersey
My Commission expires: ___9/26/2016____

BETH LASHLEY
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 9/26/2016

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3157  3/09  (rev. 10/10) *(page 8 of 9 pages)*
**Loan No:** ▋▋▋▋▋▋
8306 03/11

Date available 07/23/2013. Printed 03/17/2015.

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0171,

7412    0172

_____

Mortgage Electronic Registration Systems, Inc - Nominee for Lender

Title:    **CANDACE GALLARDO, ASST. SECRETARY**

_____ [Space Below This Line For Acknowledgments] _____

State of New Jersey, County of Burlington

On _____4/5_____, 20_12_, before me,
_____Beth Lashley_____
a notary Public in and for said State, personally appeared

    **CANDACE GALLARDO, ASST. SECRETARY**

_____

of Mortgage Electronic Registration Systems, Inc - Nominee for Lender or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their capacity, and that by their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

_____
Notary Public of New Jersey
My Commission expires: __9/26/2016__

BETH LASHLEY
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 9/26/2016

**This Document Prepared By:**
**PHH Mortgage Corporation**
**PO Box 5449**
**Mount Laurel, NJ 08054**

**Record and Return To:**
**Mortgage Services**
**PO Box 5449**
**Mount Laurel, NJ 08054**

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Loan No: ▮▮▮▮▮▮   Form 3157  3/09  (rev. 10/10) *(page 9 of 9 pages)*
8306 03/11

Date available 07/23/2013. Printed 03/17/2015.

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0172.

7412        0173

## Exhibit "A"

Loan Number: ▮▮▮▮▮▮
Property Address: **203 GRAND DRIVE, TANEYTOWN, MD 21787**

Legal Description:
BEING KNOWN AND DESIGNATED as Lot No. 25, Block C, as shown on a Plat
entitled, "Second Amended Plat of Section One and First Amended Plat of
Section Two, Green Meadows," which Plat is recorded among the Land Records of
Carroll County in Plat Book No. 28, page 137. The improvements thereon
currently being known as No. 203 Grand Drive. TAX ID No. ▮▮▮▮▮▮

Loan No: ▮▮▮▮▮▮

Exhibit A Legal Description Attachment

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0173.     Date available 07/23/2013. Printed 03/17/2015.

7412   0174

## State of Maryland Land Instrument Intake Sheet

☐ Baltimore City   ☑ County: CARROLL

*Information provided is for the use of the Clerk's Office, State Department of Assessments and Taxation, and County Finance Office Only.*
**(Type or Print in Black Ink Only—All Copies Must Be Legible)**

| 1 | Type(s) of Instruments | Check Box if addendum Intake Form is Attached.) | | | |
|---|---|---|---|---|---|
| | | ☐ Deed | ☐ Mortgage | ☒ Other LOAN MODIFICATION | ☐ Other _____ |
| | | ☐ Deed of Trust | ☐ Lease | | |

| 2 | Conveyance Type Check Box | ☐ Improved Sale Arms-Length *[1]* | ☐ Unimproved Sale Arms-Length *[2]* | ☐ Multiple Accounts Arms-Length *[3]* | ☐ Not an Arms-Length Sale *[9]* |
|---|---|---|---|---|---|

| 3 | Tax Exemptions (if applicable) Cite or Explain Authority | Recordation | |
|---|---|---|---|
| | | State Transfer | |
| | | County Transfer | |

| 4 | Consideration and Tax Calculations | Consideration Amount | | Finance Office Use Only Transfer and Recordation Tax Consideration | |
|---|---|---|---|---|---|
| | | Purchase Price/Consideration | $ | | |
| | | Any New Mortgage | $ 10,549.51 | Transfer Tax Consideration | |
| | | Balance of Existing Mortgage | $ | X ( ) % = | |
| | | Other: | $ | Less Exemption Amount | - |
| | | Other: | $ | Total Transfer Tax = | |
| | | | | Recordation Tax Consideration | |
| | | | | X ( ) per $500 = | |
| | | Full Cash Value: | $ | TOTAL DUE | |

| 5 | Fees | Amount of Fees | Doc. 1 | Doc. 2 | Agent: |
|---|---|---|---|---|---|
| | | Recording Charge | $ | $ | |
| | | Surcharge | $ | $ | Tax Bill: |
| | | State Recordation Tax | $ | $ | |
| | | State Transfer Tax | $ | $ | C.B. Credit: |
| | | County Transfer Tax | $ | $ | |
| | | Other | $ | $ | Ag. Tax/Other: |
| | | Other | $ | $ | |

| 6 | Description of Property | District | Property Tax ID No. (1) | Grantor Liber/Folio | Map | Parcel No. | Var. LOG |
|---|---|---|---|---|---|---|---|
| | SDAT requires submission of all applicable information. A maximum of 40 characters will be indexed in accordance with the priority cited in Real Property Article Section 3-104(g)(3)(i). | | Subdivision Name | Lot (3a) | Block (3b) | Sect/AR (3c) | Plat Ref. | Sq.Ft/Acreage (4) |
| | | GREEN MEADOWS | | 25 | C | | |

Location/Address of Property Being Conveyed (2)

203 GRAND DRIVE, TANEYTOWN, MD 21787

| Other Property Identifiers (if applicable) | | Water Meter Account No. |
|---|---|---|

Residential ☑ or Non-Residential ☐   Fee Simple ☑ or Ground Rent ☐   Amount: _____
Partial Conveyance? ☐ Yes ☑ No   Description/Amt. of SqFt/Acreage Transferred: _____

If Partial Conveyance, List Improvements Conveyed:

| 7 | Transferred From | Doc. 1 – Grantor(s) Name(s) | Doc. 2 – Grantor(s) Name(s) |
|---|---|---|---|
| | | SEAN P PUCKETT | |
| | | Doc. 1 – Owner(s) of Record, if Different from Grantor(s) | Doc. 2 – Owner(s) of Record, if Different from Grantor(s) |

| 8 | Transferred To | Doc. 1 – Grantee(s) Name(s) | Doc. 2 – Grantee(s) Name(s) |
|---|---|---|---|
| | | COLDWELL BANKER MORTGAGE | |
| | | New Owner's (Grantee) Mailing Address | |

| 9 | Other Names to Be Indexed | Doc. 1 – Additional Names to be Indexed (Optional) | Doc. 2 – Additional Names to be Indexed (Optional) |
|---|---|---|---|

| 10 | Contact/Mail Information | Instrument Submitted By or Contact Person | ☑ Return to Contact Person |
|---|---|---|---|
| | | Name: MEGAN GAMBLE | |
| | | Firm  MORTGAGE SERVICES | ☐ Hold for Pickup |
| | | Address: 1 MORTGAGE WAY MT LAUREL, NJ 08054 | |
| | | Phone: (877) 766-8244 | ☐ Return Address Provided |

| 11 | Assessment Information | IMPORTANT: *BOTH THE ORIGINAL DEED AND A PHOTOCOPY MUST ACCOMPANY EACH TRANSFER* | |
|---|---|---|---|
| | | ☐ Yes ☐ No   Will the property being conveyed be the grantee's principal residence? | |
| | | ☐ Yes ☐ No   Does transfer include personal property? If yes, identify: | |
| | | ☐ Yes ☐ No   Was property surveyed? If yes, attach copy of survey (if recorded, no copy required). | |

**Assessment Use Only – Do Not Write Below This Line**

| Terminal Verification | | Agricultural Verification | | Whole | Part | Tran. Process Verification | |
|---|---|---|---|---|---|---|---|
| Transfer Number | Date Received: | | Deed Reference: | | | Assigned Property No.: | |
| Year | 20 | 20 | Geo. | Map | | Sub | Block |
| Land | | | Zoning | Grid | | Plat | Lot |
| Buildings | | | Use | Parcel | | Section | Occ. Cd. |
| Total | | | Town Cd. | Ex. St. | | Ex. Cd. | |

REMARKS:

Distribution:   White – Clerk's Office      Canary – SDAT
Pink – Office of Finance    Goldenrod – Preparer
AOC-CC 300 (4/05)

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7412, p. 0174,   Date available 07/23/2013. Printed 03/17/2015.

Recording Requested By:
PHH Mortgage Corporation (PHHM)

When Recorded Return To:

LEGAL ENTITY REVIEW DEPARTMENT
PHH Mortgage Corporation (PHHM)
1 MORTGAGE WAY
PO BOX 5449
Mt. Laurel, NJ 08054

```
LR - Assignment Recording
Fee                      20.00
Grantor/Grantee Name:
puckett
Reference/Control #:
LR - Assignment Surcharge
                         40.00
LR - Additional Recording
Fee - linked              0.00
================================
SubTotal:                60.00
================================
Total:                   60.00
#
07/30/2013  09:20   CC06-08
#                - Carroll
County/CC05.02.01 - Register
```

**CORPORATE ASSIGNMENT OF DEED OF TRUST** 01 302

**Carroll, Maryland**
**SELLER'S SERVICING #:** ████PUCKETT "PUCKETT"
**SELLER'S LENDER ID#: LERMER**

**MERS #:** ████████ **SIS #: 1-888-679-6377**

Date of Assignment: May 13th, 2013
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR
COLDWELL BANKER MORTGAGE at PO BOX 2026, FLINT, MI 48501-2026
Assignee: PHH MORTGAGE CORPORATION at 1 MORTGAGE WAY, MT. LAUREL, NJ 08054

Executed By: SEAN P PUCKETT, AN UNMARRIED MAN  To: MERS AS NOMINEE FOR COLDWELL
BANKER MORTGAGE
Date of Deed of Trust: 04/28/2006 Recorded: 05/04/2006 in Book/Reel/Liber: 4853 Page/Folio: 0431 as
Instrument No.: 726450 In the County of Carroll, State of Maryland.

Property Address: 203 GRAND DRIVE, TANEYTOWN, MD 21787

  KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and
sufficiency of which is hereby acknowledged, the said assignor hereby assigns unto the above-named
assignee, the said Deed of Trust having an original principal sum of $226,800.00 with interest, secured
thereby, with all moneys now owing or that may hereafter become due or owing in respect thereof, and the
full benefit of all the powers and of all the covenants and provisos therein contained, and the said assignor
hereby grants and conveys unto the said assignee, the assignor's beneficial interest under the Deed of
Trust.
  TO HAVE AND TO HOLD the said Deed of Trust, and the said property unto the said assignee forever,
subject to the terms contained in said Deed of Trust.

  IN WITNESS WHEREOF, the assignor has executed these presents the day and year first above
written:

  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR COLDWELL
BANKER MORTGAGE
On  5.17.13

By: _____
CANDACE GALLARDO, Assistant Secretary

████████ PUCKETT MDSTATE_TRUST_ASSIGN_ASSN "MG"MGPHHM"

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7427, p. 0149     Date available 08/02/2013. Printed 03/17/2015.

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 2 of 2

STATE OF New Jersey
COUNTY OF Burlington

On _5-17-13_____, before me, REBECCA L. SEAMAN, a Notary Public in and for Burlington in the State of New Jersey, personally appeared CANDACE GALLARDO, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

REBECCA L. SEAMAN
Notary Expires: 08/22/2017

REBECCA L. SEAMAN
NOTARY PUBLIC OF NEW JERSEY
ID # 2424214
My Commission Expires 8/22/2017

(This area for notarial seal)

PUCKETT MDSTATE_TRUST_ASSIGN_ASSN *MG*MGPHHM*

Date available 08/02/2013. Printed 03/17/2015.

CARROLL COUNTY CIRCUIT COURT (Land Records) DBS 7427, p. 0150.

DATE    03/12/2015

THE MORTGAGE SERVICE CENTER
2001 BISHOPS GATE BLVD
MT LAUREL, NJ 08054

**Exhibit 1**

## CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME      SEAN PUCKETT
STREET         203 GRAND DRIVE
CITY STATE ZIP TANEYTOWN, MD. 21787

LOAN NUMBER:

### ACTIVITY FOR PERIOD 01/01/2014 - 12/31/2014

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance | Escrow Balance | Advance Balance | Suspense Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0035596782 | 01/01/2014 | | | | | | | | | | | 217513.80 | -2483.70 | 0.00 | 0.00 |
| 0035596782 | 01/16/2014 | 152 | | 32.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.42 | 217513.80 | -2483.70 | 0.00 | 0.00 |
| 0035596782 | 02/18/2014 | 152 | | 32.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.42 | 217513.80 | -2483.70 | 0.00 | 0.00 |
| 0035596782 | 03/17/2014 | 152 | | 32.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.42 | 217513.80 | -2483.70 | 0.00 | 0.00 |
| 0035596782 | 03/19/2014 | 170 | 02/01/2013 | 0.00 | 50.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00 | 217513.80 | -2483.70 | 0.00 | 0.00 |
| 0035596782 | 04/16/2014 | 351 | 04/01/2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -790.00 | 0.00 | 0.00 | 217513.80 | -3273.70 | 0.00 | 0.00 |
| 0035596782 | 04/16/2014 | 152 | | 32.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.42 | 217513.80 | -3273.70 | 0.00 | 0.00 |
| 0035596782 | 07/16/2014 | 152 | | 32.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.42 | 217513.80 | -3273.70 | 0.00 | 0.00 |
| 0035596782 | 09/08/2014 | 312 | 09/01/2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -1211.38 | 0.00 | 0.00 | 217513.80 | -4485.08 | 0.00 | 0.00 |
| 0035596782 | 10/16/2014 | 152 | | 32.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.42 | 217513.80 | -4485.08 | 0.00 | 0.00 |
| 0035596782 | 11/17/2014 | 152 | | 32.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.42 | 217513.80 | -4485.08 | 0.00 | 0.00 |
| 0035596782 | 11/26/2014 | 312 | 12/01/2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -1213.05 | 0.00 | 0.00 | 217513.80 | -5698.13 | 0.00 | 0.00 |
| 0035596782 | 12/04/2014 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1470.00 | 0.00 | 217513.80 | -5698.13 | 1470.00 | 0.00 |
| 0035596782 | 12/04/2014 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 150.00 | 0.00 | 217513.80 | -5698.13 | 1620.00 | 0.00 |
| 0035596782 | 12/04/2014 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 465.00 | 0.00 | 217513.80 | -5698.13 | 2085.00 | 0.00 |
| 0035596782 | 12/04/2014 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 60.00 | 0.00 | 217513.80 | -5698.13 | 2145.00 | 0.00 |
| 0035596782 | 12/04/2014 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 160.00 | 0.00 | 217513.80 | -5698.13 | 2305.00 | 0.00 |
| 0035596782 | 12/04/2014 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7.57 | 0.00 | 217513.80 | -5698.13 | 2312.57 | 0.00 |
| 0035596782 | 12/04/2014 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 200.00 | 0.00 | 217513.80 | -5698.13 | 2512.57 | 0.00 |
| 0035596782 | 12/16/2014 | 152 | | 32.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.42 | 217513.80 | -5698.13 | 2512.57 | 0.00 |
| 0035596782 | 12/31/2014 | 152 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 217513.80 | -5698.13 | 2512.57 | 0.00 |

DATE        03/12/2015

THE MORTGAGE SERVICE CENTER
2001 BISHOPS GATE BLVD
MT LAUREL, NJ 08054

## CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME      SEAN PUCKETT
STREET         203 GRAND DRIVE
CITY STATE ZIP TANEYTOWN, MD, 21787

LOAN NUMBER: ▮

### ACTIVITY FOR PERIOD 01/01/2015 - 03/12/2015

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance | Escrow Balance | Advance Balance | Suspense Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0035596782 | 01/01/2015 | | | | | | | | | | | 217513.80 | -5698.13 | 2512.57 | 0.00 |
| 0035596782 | 01/16/2015 | 152 | | 32.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.42 | 217513.80 | -5698.13 | 2512.57 | 0.00 |
| 0035596782 | 02/17/2015 | 152 | | 32.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.42 | 217513.80 | -5698.13 | 2512.57 | 0.00 |
| 0035596782 | 03/12/2015 | | | | | | | | | | | 217513.80 | -5698.13 | 2512.57 | 0.00 |

Exhibit

C

**Real Property Data Search ( w4)**

**Guide to searching the database**

**Search Result for CARROLL COUNTY**

| View Map | View GroundRent Redemption | | View GroundRent Registration |
|---|---|---|---|
| Account Identifier: | **District - 01 Account Number -** ▮ | | |

### Owner Information

| Owner Name: | PUCKETT SEAN P | Use: | RESIDENTIAL |
|---|---|---|---|
| | | Principal Residence: | YES |
| Mailing Address: | 203 GRAND DR TANEYTOWN MD 21787-2305 | Deed Reference: | /04853/ 00428 |

### Location & Structure Information

| Premises Address: | 203 GRAND DR TANEYTOWN 21787-2305 | Legal Description: | LT 25 - 8243 SQ FT GRAND DR 28-137 GREEN MEADOWS BLK C |
|---|---|---|---|

| Map: | Grid: | Parcel: | Sub District: | Subdivision: | Section: | Block: | Lot: | Assessment Year: | Plat No: | |
|---|---|---|---|---|---|---|---|---|---|---|
| ▮ | | | 0000 | | | C | 25 | 2015 | Plat Ref: | 0028/ 0137 |

| Special Tax Areas: | | Town: | | TANEYTOWN |
|---|---|---|---|---|
| | | Ad Valorem: | | |
| | | Tax Class: | | |

| Primary Structure Built | Above Grade Enclosed Area | Finished Basement Area | Property Land Area | County Use |
|---|---|---|---|---|
| 1988 | 1,004 SF | 330 SF | 8,243 SF | |

| Stories | Basement | Type | Exterior | Full/Half Bath | Garage | Last Major Renovation |
|---|---|---|---|---|---|---|
| | | SPLIT FOYER | SIDING | 1 full/ 1 half | | |

### Value Information

| | Base Value | Value | Phase-in Assessments | |
|---|---|---|---|---|
| | | As of 01/01/2015 | As of 07/01/2014 | As of 07/01/2015 |
| Land: | 73,000 | 73,000 | | |
| Improvements | 89,600 | 88,600 | | |
| Total: | 162,600 | 161,600 | 162,600 | 161,600 |
| Preferential Land: | 0 | | | 0 |

### Transfer Information

| Seller: PENN FRANKLIN E JR | Date: 05/04/2006 | Price: $252,000 |
|---|---|---|
| Type: ARMS LENGTH IMPROVED | Deed1: /04853/ 00428 | Deed2: |
| Seller: PENN FRANKLIN E JR | Date: 02/24/1999 | Price: $0 |
| Type: NON-ARMS LENGTH OTHER | Deed1: /02166/ 00574 | Deed2: |
| Seller: POWERS CONSTRUCTION COMPANY | Date: 11/21/1988 | Price: $85,900 |
| Type: NON-ARMS LENGTH OTHER | Deed1: /01117/ 00543 | Deed2: |

### Exemption Information

| Partial Exempt Assessments: | Class | 07/01/2014 | 07/01/2015 |
|---|---|---|---|
| County: | 000 | 0.00 | |
| State: | 000 | 0.00 | |
| Municipal: | 000 | 0.00|0.00 | 0.00|0.00 |
| Tax Exempt: | | Special Tax Recapture: | |
| Exempt Class: | | NONE | |

### Homestead Application Information

Homestead Application Status: No Application

| Represents Redacted Information |
|---|